Mr. Justice CAMPBELL.
I concur in the judgment pronounced by the Chief Justice, but the importance of the cause, the expectation and interest it has awakened, and the responsibility involved in its determination, induce me to file a separate opinion.
The case shows that the plaintiff, in the year 1834, was a negro slave in Missouri, the property of Dr. Emerson, a surgeon in the army of the United States. In 1834, his master took him to the military station at Rock Island, on the border of Illinois, and in 1836 to Fort Snelling; in the present Minnesota,- then Wisconsin, Territory. While at Fort Snelling, ■the plaintiff married a slave who was there with her master, and two children have been born of this connection; one during the journey of the family in returning to Missouri, and the other after their return to that Stated
Since 1838, the plaintiff and the members of his family have been in Missouri in the condition of slaves. The object of this suit is to establish their freedom. The defendant, who claims the plaintiff and his family, under the title of Dr. Emerson, denied the jurisdiction of the Circuit Court, by the plea that the plaintiff was a negro of African blood, the descendant of Africans who had been imported and sold in this country as slaves, and thus he had no capacity as a citizen of Missouri to maintain a suit in the Circuit Court. The court sustained a demurrer to this plea, a trial was then had upon the general issue, and special pleas to the effect that the plaintiff' and his family were slaves belonging to the defendant.
My opinion in this case is not affected by the plea to the jurisdiction, and I shall not discuss the questions it suggests. The claim of the plaintiff to freedom depends upon the effect to be given to his absence from Missouri, in company with his master, in Illinois and Minnesota, and this effect is to be ascertained by a reference to the laws of Missouri. For the trespass complained of was committed upon one claiming to be a freeman and a citizen, in that State, and who had been living for years under the dominion of its laws. And the rule is; that whatever is a justification where the thing is done, must be a justification in the forum where the case is tried. (20 How. St. Tri., 234; Cowp. S. C., 161.)
The Constitution of Missouri recognises slavery as a legal condition, extends guaranties to the masters of slaves, and in *494 vites immigrants to introduce them, as property, by a promise of protection. The laws of the State charge the master with the custody of the slave, and provide for the maintenance and security of their relation.
The Federal Constitution and the acts of Congress provide for the return of escaping slaves within the limits of the Union. No removal of the slave beyond the limits of the State, against the consent of the master, nor residence there in another condition, would be regarded as an effective manumission by the courts of Missouri,.upon his return to the State. “ Sicut liberis captis status restituitur sic servus domino.” Nor can the master emancipate the slave within the State, except through the agency of a public authority. The inquiry arises, whether the manumission of the slave is effected by his removal, with the consent of the master, to a community where the law of slavery does not exist, in a case where neither the master nor slave discloses a purpose to remain permanently, and where both parties have continued to maintain their existing relations. What is the law of Missouri in such a case? Similar inquiries have arisen in a great' number of suits, and the discussions in the State courts have relieved the subject of much of its difficulty. (12 B. M. Ky. R., 545; Foster v. Foster, 10 Gratt. Va. R., 485; 4 Har. and McH. Md. R., 295; Scott v. Emerson, 15 Misso., 576; 4 Rich. S. C. R., 186; 17 Misso., 434; 15 Misso., 596; 5 B. M., 173; 8 B. M., 540, 633; 9 B. M., 565; 5 Leigh, 614; 1 Raud., 15; 18 Pick., 193.)
The result of these discussions is, that in general, the status, or civil and political capacity of a person, is determined,, in the first instance, by the law of the domicil where he is born; that the legal effect on persons, arising from the operation of the law of that domicil, is not indelible, but that a new capacity or status may be acquired by a change of domicil. That questions of status are closely connected with considerations arising out of the social and political organization of the State where they originate, and each sovereign power must determine them within its own territories.
A large class of cases has been decided upon the second of the propositions above stated, in the Southern and Western courts — cases in which the law of the actual domicil was adjudged to have altered the native condition and status of the slave, although he had never actually possessed the status of freedom in that domicil. (Rankin v. Lydia, 2 A. K. M.; Herny v. Decker, Walk., 36; 4 Mart., 385; 1 Misso., 472; Hunter v. Fulcher, 1 Leigh.)
I do not impugn the authority of these cases. No evidence is found in the record to establish the existence of a domicil *495 acquired by tbe master and slave, either in Illinois or Minnesota. The master is described as an officer of the army, who was transferred. from one station to another, along the Western frontier, in- the line of his duty, and who, after performing the usual tburs of service, returned to Missouri; these slaves returned to Missouri with him, and had been there for near fifteen years, in that condition, when this suit was instituted. But absence, in the performance of military duty, without more, is a fact of no importance in determining a question of a change of domicil. Questions of that kind depend upon acts and intentions, and are ascertained from motives, pursuits, the condition of the family, and fortune of the party, and no change will be inferred, unless evidence shows that one domicil was abandoned, and there was an intention to acquire another. (11 L. and Eq., 6; 6 Exch., 217; 6 M. and W., 511; 2 Curt. Ecc. R., 368.)
) The cases first Cited deny the authority of a foreign law' to dissolve, relations which have been legally contracted in the State Where the parties are, and have their actual domicil — relations which were-never questioned during their absence from that State — relations which are consistent with the native capacity and' condition of the respective parties,' and with the policy of the State-where they reside; but'which relations were inconsistent with the policy or laws, of the State or. Territory within which they had been for a time, and from which they had. returned, with these relations, undisturbed. .It is upon the assumption, that the law of Illinois or Minnesota was indelibly'impressed upon the slave, and its consequences carried -into Missouri, that the claim of the .plaintiff depends. . The importance of the case entitles the doctrine on which it rests to a careful examination.
It will be conceded, that in countries where no. law or regulation prevails, opposed to the existence and consequences of slavery, persons who are born in that condition in a foréign State would not be liberated by the accident of their intro-gression. The relation of domestic slavery is recognised in the law of nations, and the interference of the authorities of one State with the rights of a master belonging to another, without a valid cause, is a violation of that lay. (Wheat. Law of Na., 724; 5 Stats. at Large, 601; Calh. Sp., 378; Reports of the Com. U. S. and G. B., 187, 238, 241.)
The public law of Europe formerly permittéd a master to reclaim his bondsman, yithin a limited period, wherever he could find him, and one of the capitularies of Charlemagne abolishes the rule of prescription. 'He directs, “that,wheresoever, within the bound's of Italy, either the runaway .slave of the king, or of *496 the church, or of any other man, shall he found by his master, he shall he restored without any bar or prescription of years; yet upon the provision that the master he a Frank or German, or of any other nation (foreign ;) but if he be. a Lombard’or a Roman, he shall acquire or receive his slaves by that law which has been established from ancient times among them.” "Without referring for precedents abroad, or to the colonial history, for similar instances, the history of the Confederation and Union affords evidence to attest the existence of this ancient law. In 1783, Congress directed General Washington to continue his remonstrances to the commander of the British forces respecting the permitting negroes belonging to the citizens of these States to leave New York, and to insist upon the discontinuance of' that measure. In 1788, the resident minister of the United States at Madrid was instructed to obtain from the Spanish Crown orders to its Governors in Louisiana and Florida, “to permit and facilitate the apprehension of fugitive slaves- from the States, promising that the States would observe’ the like conduct respecting fugitives from Spanish subjects.” The committee that made the report of this resolution consisted-of Hamilton, Madison, and Sedgwick, (2 Hamilton’s Works, 473;) and the clause in the Federal Constitution providing for the restoration of fugitive slaves is a recognition of this ancient right, and of the principle that a change of place does not effect a change of condition. The diminution of the power of a master to reclaim his escapiúg bondsman in Europe commenced in the enactment of laws of prescription in favor of privileged communes. . Bremen, Spire, Worms, Vienna, and Ratisbon, in Germany; Carcassonne, Beziers, Toulouse, and Paris, in France, acquired privileges on this-subject at an early period. The ordinance of William the Conqueror, that a residence of any of the servile population of England, for a year and a day, without being claimed, in any city, burgh, walled town, or castle of the King; should entitle them to perpetual liberty, is a specimen of these laws.
The earliest publicist who has discussed this subject is Bodin, a jurist of the sixteenth century, whose work was quoted in the early discussions of the courts in France and England on this subject. He says: “In France, although there be some remembrance of old servitude, yet it is not lawful here to make a slave or to buy any one of others, insomuch as the slaves of. strangers, so soon as they set their foot within France, become, frank and free, as was determined by an old decree of the court of Paris against, an ambassador of Spain, who had brought a slave with him into France.” He states another case, whieh' arose in the city of Toulouse, of a Genoese merchant, who had *497 carried a slave into that city on his voyage from Spain; and when the matter was brought before the magistrates,, the “procureur of the city, out of the records, showed certain ancient privileges given unto them of Tholouse, wherein it'was granted that slaves, so soon as they should come into Tholouse, should he free.” These cases were cited with much approba-. tion in the discussion of the claims of the West India slaves of Yerdelin for freedom, in 1738, before the judges in admiralty, (15 Causes Celébrés, p. 1; 2 Masse Droit Com., sec. 58,) and were reproduced before Lord Mansfield, in the cause of Somersett, in 1772. Of the cases cited by Bodin, it is to be observed that Charles Y of France exempted all the inhabitants of Paris from serfdom, or other feudal incapacities, in 1371, and this was confirmed by several of his successors, (3 Dulaire His., de Par., 546; Broud. Cout. de Par., 21,) and the ordinance of Toulouse is preserved as follows: “ Civitas Tholo-sana fuit et erit sine fine libera, adeo ut servi et ancillce,' sclavi et '■sclavce, dominos sive dominas habentes, cum,rebus vel sine rebus,suis, ad Tholosam vel infra términos extra urbem terminatos accedentes acguirant libertaiem.” (Hist. de Langue, tome 3, p. 69; Ibid. 6, p. 8; Loysel Inst., b. 1, sec. 6.)
The decisions were made upon special ordinances, or charters, which contained positive prohibitions, of slavery,, and where liberty had been granted as a privilege; and the history of Paris furnishes but little support for the boast that she was a “sacro sancta civitas,” where liberty always had an asylum, or for the “self-complacent rhapsodies” of the French advocates in the case of Yerdelin, which amused the grave lawyers who argued'the case of • Somersett. ■ The cáse of Yerdelin was decided upon a special ordinance, which prescribed the conditions on which.West India slaves' might be introduced into France, and which', had been disregarded by the master.
The cash of Somersett was' that of a Virginia slave carried to England by-his master, in 177.0, and who remained there two years. For some cause, he was confined on a vessel destined to Jamaica, where he was to be Sold. Lord Mansfield, upon a-return to a habeas corpus, states the question involved* “Here, the person of the slave himself,” he says, “is the immediate subject of inquiry, Can any dominion, authority, or coercion, ,be exercised in this country,1 according to the American laws?” He answers: “The difficulty of adopting the relation* without adopting it in all its-consequences, is indeed extreme, and yet many of those consequences are absolutely contrary to the municipal law of England.” Again, he says: “The return states that the slave departed, and refused to he be sold “ So high *498 an act of . dominion must be recognised by the law of tbe country where it is used. The power of the master over his slave has been extremely different in different countries.” “ The state óf slavery is of such a nature, that it is incapable of being introduced on any reasons, moral or political, but only by positive law, which preserves its force long after the reasons, occasion, and time itself, from whence it was created, are, erased, from the memory. It is so odious, that nothing can be suffered to support it but positive law.” That there is a difference in the systems of States, which recognise and which do not recognise the institution of slavery, cannot be disguised. Constitutional law, punitive law, police, domestic economy, industrial-pursuits, and amusements, the modes of thinking and of belief of the population of the respective communities, all show-the profound influence exerted upon society by this single arrangement. This influence was discovered in the Federal, Convention, in the deliberations on the plan of the Constitution. Mr. Madison observed, “that the States were divided into different interests, not by their difference of size, but by other circumstances; the most material of which, aesulted partly from climate, but principally from the effects ■of their having or not having slaves. These two causes concur in forming the great division of interests in the United States.”
• The question to be raised with the opinion of Lord Mansfield, therefore, is not in respect to the incongruity of the two' systems, but whether slavery was absolutely contrary to the law of England; for if it was so, clearly, the American laws ■could not operate there. Historical research ascertains that at the date of the Conquest the rural population of England were generally in a servile condition, and under various names, denoting slight variances in condition, they were sold with the land like -eattle, and were a part of its living money. Traces -of the existence of African slaves are to be found in the early Chronicles. Parliament in the time of Richard IT, and also -of Henry YIH, refused to adopt a general .law of emancipation. Acts of emancipation by the last-named monarch- and by Elizabeth are preserved.
The African slave .trade had been carried on, under the unbounded protection of the Crown, for near two centuries, when the case of iSomersett was heard, and no motion for its suppression had ever been submitted to Parliament; while it was forced upon and maintained in unwilling colonies by the Par-, liament and Crown of England at that monfent. Fifteen thousand-negro-slaves were then'living in that island, where they had been introduced under the counsel of the most illustrious jurists of the '¡realm, and such' slaves had been publicly *499 sold for near a. century in tibe markets of London. In the ’ northern part of the kingdom of Great Britain there, existed a class of from 30,000 to 40,000 persons, of whom the Parliament said, in 1775, (15 George III, chap. 28,) “many colliers, coal-heavers, and salters, are in a state of slavery or bondage, bound to the collieries and salt works, where they work for life, transferable with the collieries and salt works when their original masters have no use for them; and whereas the emancipating or setting free the colliers, coal-heavers, and salters, in Scotland, who are now in a state of servitude, gradually and upon reasonable conditions, would be the means of increasing the number of colliers, coal-heavers, and salters, to the great benefit of the public, without doing any injury to the present masters, and would remove the reproach of allowing such a state of servitude to exist in a free country,” &c.; and again, in 1799, “they declare that many colliers and coal-heavers still continue in a state of bondage.” Ho statute, from the Conquest till the 15 George HI,, had been passed upon the subject of personal slavery. These facts have led the most eminent civilian of England to question the' accuracy of this judgment, and to insinuate that in this judgment.the offence of ampliare jurisdictionem by private authority was committed by the eminent magistrate who pronounced it/
This sentence is distinguishable from thosé cited from the French courts in this: that there positive prohibitions existed against slavery, and the right to. freedom was conferred on the immigrant slave by positive law; whereas here the consequences of slavery merely — that is, the public policy — were fóund to be contrary to the law of slavery. The case of the slave Grace, (2 Hagg.,) with' four others, came before Lord Stowell in 1827, by appeals from the West India Vice admiralty-courts. ■ They were cases of slaves who had returned to those islands, after a residence in Great Britain, and where the claim to freedom was first presented .in the colonial forum. The learned judge in that case said: “This suit fails in its foundation: She.(Grace) was not a free person; no injury is done her by her-continuance in slavery, and she has no pretensions to any other station than that which was enjoyed by every slave of a family. If she depends upon such freedom conveyed by a mere residence in England, she complains of a violation of right which she possessed no.longer than whilst she resided in England, but which totally expired when that residence ceased, and she was imported into Antigua.”
. The decision of Lord Mansfield was, “that so high an act of dominion ” as .the master exercise^ .over his slave, in sending him abroad for sale, could not be exercised in England *500 under the American laws, and contrary to the spirit of their own.
The decision of Lord Stowell is, that the authority of the English laws terminated when the slave departed from England. That the laws of England were not imported into Antigua, with the slave, upon her return, and that the colonial forum had no warrant for applying a foreign eode to dissolve relations which .had existed between persons belonging to that island, and which were legal according to its own system. There is no distinguishable difference between the case before us and that detercnined in the admiralty of Great Britain.
The complaint here, in my opinion, amounts to this : that the- judicial tribunals of Missouri have not denounced as odious the Constitution and laws under which they are organized, and have not superseded them on their own private authority, for the purpose of applying the laws of Illinois, or those passed by Congress for Minnesota, in their stead. • The eighth section of the act of Congress of the 6th of March, 1820, (3 Statutes at Large, 545,) entitled; “An act to authorize the people of Missouri to form a State Government,” &e., &e., is referred to, as affording the authority to this court to pronounce the sentence which the Supreme Court of Missouri felt themselves constrained to refuse. That section of the act prohibits slavery in the district of country west of the Mississippi, north of thirty-six degrees thirty minutes north latitude, vjhieh belonged to the ancient province of Louisiana, hot included in Missouri.
It is a settled doctrine of this court, that the Eederal Government can exercise no power over the subject of slavery within the States, nor control the intermigration of slaves, "other than fugitives, among the States. . Kbr can that Government affect the duration of slavery within the States^ other than by a legislation over the foreign slave trade. The power of Congre* to adopt the section of the act above cited must therefore depend upon some condition of the Territories which distinguishes them from States, and subjects them to a control more extended. • The third section of the fourth article of the Constitution is referred to as the only and all-sufficient grant to support this claim. It is, that “ new States may be admitted by the Congress to this Union; but no hew State shall be formed or erected within the jurisdiction of any other. State, nor any State be formed by the junction of two or more States, or parts of States, without the consent of the Legislar tures of the States concerned, as. well as of the Congress. The Congress shall have power to dispose of and make all needful rules and regulations respecting the' territory of other propr *501 erty belonging to the United States; and nothing in this Con- ' stitution snail be so construed as to prejudice any claims of the United States, or of any particular State.”
It is conceded, in the decisions of this court, that Congress may secure the rights of the United States in the public domain, provide for the sale or lease of any part of it, and establish the validity of the titlés of the purchasers, and may organize Territorial Governments, with powers of legislation. (3 How., 212; 12 How., 1; 1 Pet., 511; 13 P., 436; 16 H., 164.)
But the recognition of a plenary power in Congress to dispose of the public domain, or jfco organize a Government over it, does not imply a corresponding authority to determine the internal polity, or to adjust the domestic relations, or the persons who may lawfully inhabit the territory in which it is situated. A supremé power to make needful rules respecting the ■public domain,, and a! similar power of framing laws to operate upon persons and things within the territorial limits where it lies, are distinguished by broad lines of demarcation in American history. This court has assisted us to define them. In Johnson v. McIntosh, (8 Wheat., 595—543,) they say: “According to the theory of the British Constitution, all vacant lands are vested in the Crown; and the exclusive power to grant them is admitted to reside in the Crown, as a branch of the royal prerogative.
“All the lands we hold were' originally granted by the Crown, and the Establishment of a royal Government has never been considered as impairing its right to grant lands within the chartered limits of such colony.”
• 'And the British Parliament did claim a supremacy of legislation coextensive with the absoluteness of the dominion of the sovereign over the Crown lands. The American doctrine, to the contrary, is embodied in two brief resolutions of the people of Pennsylvania, in 1774: 1st. “ That the inhabitants of these colonies are entitled to the same rights and liberties, within the colonies, that the subjects born in England are entitled within the realm.” 2d. “ That the power assumed by-Parliament to bind the people, of these colonies by statutes, in all cases whatever, is unconstitutional, and therefore the source of these unhappy difficulties.” The Congress of 1774, in their statement of rights and grievances, affirm “ a free and' exclusive power of legislation” in their several Provincial Legislatures, “in all eases of taxation and internal polity, subject only to the negative of their sovereign, in such manner as has been heretofore used and accustomed.” (1 Jour. Cong., 32.)
. The unanimous consent of the people of the colonies, then, *502 to the power of their sovereign, “to dispose of and make all heedful rules and regulations respecting the territory ” of the Crown, in 1774, was deemed by them as entirely consistent with opposition, remonstrance, the renunciation of allegiance, and proclamation óf civil war, in preference to submission-to his claim of supreme power in the territories. .
I pass now to the evidence afforded during the Revolution and Confederation. The American Revolution was not a social revolution. It did not alter the domestic condition or capacity of persons within the colonies, nor was it designed to disturb the domestic relations existing among them, ft was a political revolution, by which thirteen dependent colonies became thirteen independent States. “ The Declaration of Independence, was notj” says Justice Chase, “a declaration that the United Colonies jointly, in a collective capacity, were independent'States, &c., &c., &c., but .-that each of them was a-sovereign and independent State; that is, that each of them had a right to govern itself by its own authority and its own laws, without any control from any other power on earth.” (3 Dall., 199; 4 Cr., 212.)
These sovereign and independent States, being united as a Confederation, by various public acts of cession, became jointly interested in territory, and concerned to dispose of and make all needful rules and regulations respecting it. It is a conclusion not open to discussion in this court, “that there was no territory within the (original) United States, that was claimed by them in any other right than that of some-of the confederate‘States.” (Harcourt v. Gaillord, 12 Wh., 523.) . “The question whether the vacant lands within the.United States,” says Chief Justice‘Marshall, “ became joint property, or belonged to the ' separate States, was 'a momentous question, whieh threatened to shake the American Confederacy to its foundations. This important and dangerous question has been compromised, and the compromise is .not now to be contestéd.” (6 C. R., 87.)
The cessions of the States to the Confederation Were made on the condition that the territory ceded should be laid out and formed into distinct republican States, which should be admitted as members to the Federal Union, having the same rights of sovereignty, freedom, and independence, as the- other States. The first effort to fulfil this trust was made in 1785, < by the offer óf a charter or compact to the inhabitants who. might come to occupy the land.,
• Those' inhabitants were to .form for themselves temporary State Governments, founded on the Constitutions of any of the States, biit to be alterable at the will óf their Legislature; and *503 •permanent Governments were to succeed these, whenever the population became sufficiently numerous to authorize the State to enter the Confederacy; and Congress assumed to obtain powers from the States to facilitate this object. Neither in the deeds of cession of the States, nor in this compact, was a sovereign power for Congress to govern the Territories assérted. Congress retained power, by this act, “to dispose of and to make rules and regulations respecting the public . domain,” hut submitted to the people to organize a Government harmonious with those of the; confederate States.
The next sta^e in the progress of 'colonial government was the adoption oí the ordinance of 1787, by eight 'States,-, in which the plan of a Territorial Government, established by act of Congress, is'first seen.- This was adopted while the Federal Convention to- form the Constitution was sitting. The plan placed the Government in the hands of a .Governor* Secretary, and Judges, appointed by Congress, and conferred power on them to select suitable laws from the codes of the States,-until the population should equal 5,000. A Legislative. Council,- elected by the people, was then to be admitted to a share of the legislative authority* under the supervision- of Congress; and States were to be formed whenever the'number of the. population should authorize the measure.
This ordinance was addressed to the inhabitants as a fundamental compact,' and six of- its articles define the conditions to be observed in their Constitution and laws. These conditions were designed to fulfil the trust in the agreements of cession, that-the States'to he formed of the ceded Territories should be .“ distinct Republican States.” This ordinance was submitted to Virginia in 1788, and the 5th article, embodying as it does a summary of the entire act, was specifically ratified and confirmed 'by that State. This was an incorporation of the ordinance into1 her act of cession. It was conceded, in the argument, -that the authority of Congress was not adequate to the enactment of the ordinance, and that it cannot bé sup-portéd upon the Articles of Confederation. To a part of. the engagements, the assent of nine States was. required, and for another portion no provision had been made in those articles.. Mr. Madison said, in a writing nearly contemporary, but before the confirmatory act of Virginia, “Congress have proceeded to form new States, to erect temporary Governments, to appoint officers for’them, and to prescribe the conditions on which such States shall be admitted into the Confederacy; .all this has been done, and done without the least color of constitutional authority.” (Federalist, No. 38.) Richard Henry Lee, one of the committee who reported the ordinance to Con *504 gress, transmitted it to General "Washington, (15th July, 1787,) saying, “It seemed necessary, for the security of property among uninformed and perhaps licentious people, as the greater part of those who go there are, that a strong-toned Government should exist, and the rights of property he clearly defined.” The'consent of all the States represented in Congress, the consent' of the Legislature of Virginia, the consent of the inhabitants of the Territory, all concur to support the authority of this enactment. It is apparent, in the frame of the Constitution, that the Convention recognised jts validity, and adjusted parts of their work with reference to it. The authority to admit new States into the Union, the omission to provide distinctly for Territorial Governments, and the clause limiting the foreign slave trade to States then existing, which might not prohibit it, show that they regarded this Territory as provided, with a Government, and organized permanently with a restriction on the subject of slavery. Justice Chase, in the opinion already cited,' says of the Government before, and it is in some measure true during the Confederation, that “the powers of Congress originated from necessity, and arose' out of and were only limited by events, or, iñ other words, they were revolutionary in their very nature. Their extent depended upon the exigencies and necessities of public affairs; ” and there.is only one rule of construction, in regard to the acts done, Vhich will fully support them, viz: that the powers actually exercised were rightfully exercised, wherever they were supported by the implied sanction of the State Legislatures, and by the ratifications of the people.
The clauses in the 3d .section, of the -4th article of the Constitution, relative to the admission of new States, and the disposal and regulation of the territory of-the United States, were adopted without debate pi the Convention; ■
There was a warm discussion on the clauses that relate to the subdivision of the States, and the reservation^ of the claims of the United States and each of the Statesi from any. prejudice. The Maryland members revived the controversy in regard to the Crown lands of thé Southwest.. There was nothing to indicate any reference to a government ■ of .Territories not included within the limits of the Union; and the whole discussion 'demonstrates that the Convention was consciously dealing with a Territory whose condition, as to government, had beeii arranged" by a fundamental and unalterable compact.
An examination of this clause of the Constitution, by the light of the circumstances in which the Convention was placed, will aid us to determine its significance. The first clause is, “that new States may be admitted by the Congress to this *505 Union.” The condition of Kentucky, "Vermont, Rhode Island, and the' new States to be formed in the Northwest, suggested this, as a necessary addition to the powers of Congress. The next clause, providing for the subdivision of States, and the parties to consent to such an alteration, was required, by the plans on foot, for changes in Massachusetts, New York, Pennsylvania, North Carolina, and Georgia. The clause which enables Congress to dispose of and make regulations respecting the public domain, was demanded by the exigencies of an ex-haustéd treasury and a disordered finance, for relief by sales, and the preparation* for sales, Of the public lands; and the last clause, that nothing in the Constitution should prejudice the claims of the United States or a particular State, was to quiet the jealousy and irritation of those who had claimed for the United States all the unappropriated lands. I look in vain, among the discussions of the time, for the assertion of a supreme sovereignty for Congress over the territory then belonging to the United States, or that they might thereafter acquire. I seek in vain for an annunciation that a consolidated power had been inaugurated, whose subject comprehended an empire, and which had no restriction but the discretion of Congress. This disturbing element of thé Union entirely escaped the apprehensive previsions, of - Samuel Adams, George Clinton, Luther Martin, and "Patrick Henry; and, in respect to dangers from power vested .in acentral Government over distant settlements, colonies, or provinces, their instincts were always alive. Not a word escaped them, to warn their countrymen, that here was a power to threaten the landmarks of this federative Union, and with them ‘the safeguards of popular and constitutional liberty; or that under this article there might be introduced, on our soil, a single Government over avast extent of country— a Government foreign to the persons over whom it might be exercised; and capable of binding,those not represented, by statutes, in all cases whatever. I find nothing to ■ authorize these enormous pretensions, nothing in the expositions of the friends of the Constitution, nothing in the expressions of alarm by its opponents — expressions which have since been developed as prophecies. Every portion of the United States was then provided with a municipal Government, which this Constitution was not designed to supersede, but merely to modify as to its conditions.
.The compacts of cession by North Carolina and Georgia are subsequent to the Constitution. They adopt the ordinance of 1787, except the clause respecting slavery. But the precautionary repudiation of that article forms an argument quite as satisfactory to the advocates for Eederal power, as its intro *506 duction would Rave done. The refusal of a power to Congress to legislate in one place, seems to justify the seizure of the samé power when another place for its exercise is found.
This proceeds from a radical error, which lies at the foundation of much of this discussion. It is, that the Federal Government may lawfully do whatever is not directly-prohibited by the Constitution. This- would have been a fundamental error, if no amendments to the Constitution had been made. But the final expression of the will of the people of the States, in the 10th amendment, is, that the powers of the Federal Government are limited to the grants of the Constitution.
Before the cession of Georgia was made, Congress asserted rights, in respect to a part of her territory, which, require a passing notice. In 1798 and 1800, acts for the settlement of limits with Georgia, and to establish a Government in the Mississippi Territory, wejre adopted. A Territorial Government was organized, between the Chattahoochee and Mississippi 'rivers. Tliis was within the limits of Georgia. These acts-dismemhered Georgia. They established a separate Government upon her soil, while they rather derisively professed, “that the establishment of that Government shall in no respects impair the rights of the State of Georgia, either ,to the jurisdiction or soil of the Territory.” The Constitution provided that the importation of such persons as any-of the existing States shall think proper to admit, shall-not be prohibited by Congress before 1808. By these enactments, a prohibition was placed, upon the importation of slaves into Georgia, although hfer Legislature had made nofie.
This court have repeatedly affirmed the paramount, claim of Georgia to this Territory. They have denied the existence- of any title in the United States. (6 C. R., 87; 12 Wh., 523; 3 How., 212; 13 How., 381.) Yet these acts were cited in the argument as precedents to show the power of Congress in the Territories. These statutes were the occasion of earnest expostulation and bitter remonstrance on .the part of the authorities of the State, and the memory of their injustice and wrong remained long after the legal settlement of the controversy by the compact of 1802. A reference td these acts terminates what I have to say upon the Constitutions of the Territory within the original limits of the United States. These Constitutions were framed by the- concurrence of the Spates making the cessions, - and Congress, and were tendered -to immigrants who might be attracted to the vacant territory. The -legislative, powers of the officers of this Government were limited to the selection of laws from the States; .and provision was made for the introduction of popular institutions, and their emanci *507 pation from Federal control, whenever a suitable opportunity occurred. The limited reservation of legislative power to the officers of the Federal Government was excused, on the plea of 'necessity; and the probability is, that the clauses respecting slavery embody some compromise among the statesmen of that time; beyond these, the distinguishing features of the system which the patriots of the Revolution had claimed as their birthright, from Great Britain, predominated in them.
They acquisition of Louisiana, in 1808, introduced another system into the -United States. This vast'province was ceded by Napoleon, and its population had always been accustomed to a vieeroyal Government, appointed by the Crowns of France or Spain. To establish a- Government constituted on similar principles, and with like conditions, was not an unnatural proceeding. -
But there was great difficulty in finding constitutional authority for the measure. The third section' of the fourth article of the Constitution was introduced into the Constitution, on the motion of Mr. Gouverneur Morris. In 1803, he was appealed to for information in regard to its meaning. He answers : “I am very certain I had it not in contemplation to insert a decree de eoercmdo imperio in the Constitution of America. * * * I knew then, as well as I do now, that all North America must at length be annexed to us. Happy indeed, if the lust of dominion‘stop here. It would therefore have been perfectly utopian to oppose a paper restriction to the violence of popular sentiment, in a popular Government.” (3 Mor. Writ., 185.) A few days later, he makes another reply to his correspondent. “I perceive,” he says, “I mistook the drift of your inquiry, which substantially is, whether Congress can admit, as a new State,- territory which did not belong to the United States when the Constitution was made. In my opinion, they cannot. I always thought, when we should acquire Canada , and Louisiana,, it would be proper to govern THEM AS PROVINCES, AND ALLOW THEM NO VOICE m OUT COUndls. In fording the third section oe the fourth article, I went as far as circumstances would permit, to establish the exclusion. CandoR OBLIGES ME TO ADD MY BELIEF, THAT HAD IT BEEN MORE POINTEDLY EXPRESSED, A STRONG OPPOSITION WOULD HAVE BEEN MADE.” (3 Mor. Writ., 192.) The first Territorial Government of Louisiana was an Imperial one, founded upon a French or Spanish model. • For a time, the Governor, Judges, Legislative Council, Marshal, Secretary, and officers of the militia,.were appointed by the President.*
*508 Besides thes¿' anomalous arrangements, the acquisition gaye rise to jealous inquiries, as.to the influence it would exert in determining the men and States that were to he' “the arbiters áíxd- rulers ” of the destinies of the Union; and unconstitutional opinions,-having for'their aim to promote sectional divisions, were announced and developed. “Something,” said an eminent statesman,'?4 something has suggested to the members of Congress the policy of acquiring geographical majorities. This is ;a very direct step towards disunion, for it must foster the geographical enmities by which alone it can be effected. .This something must bh a contemplation of particular advantages to be derived from such majorities; and is it not notorious that they consist "of nothing else but usurpations over persons and property, by which, they can regulate the internal wealth and prosperity of States and individuals?"
. The most dangerous of the efforts to employ ¿geographical political power, tó perpetúate- a geographical preponderance in the. Union, is to be found in the.deliberations upon the act of the 6th of March, 1820, before cited.' The attempt consisted of'a proposal to exclude' Missouri from a place in the Uriion, Unless her people would adopt a Constitution containing a prohibition won the subject of slavery, according to a prescription of Congress, The sentiment is now general, if not Universal,-that Congress had no constitutional power to impose the restriction. This was frankly admitted at the bar,' in the course of this argument. The principles which this court have .pronounced conderún the pretension then made on behalf of the legislative department. In Groves v. Slaughter, (15 Pet.,) the Chief Justice said: “The power over this subject ip exclusively with' the several States, and each of them has a right to decide for itself whether it will or will not allow persons of this description to-be brought within its limits.” 'Justice McLean said: .“The Constitution of the United States operates alike in all the States,- and one State has the same powe^ over the subject of slavery as every other State.” In Pollard’s Lessee v. Hagan, (3 How., 212,) the court say: “The United States have no constitutional capacity to exercise municipal *509 jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in cases where it is delegated, and the court denies the faculty of the Federal Government to add to its powers by'treaty or compact.”
This is a necessary consequence, resulting from the nature of the Federal Constitution, which is a federal compact among the' States, establishing a limited Government, with powers delegated by the people of distinct and independent communities, who reserved to their State Governments, and to themselves, the powers they did not grant. This claim to impose a restriction upon the people of Missouri involved a denial of the constitutional relation^ between the people of the States and Congress, and affirmed a concurrent right for the latter, with their people, to constitute the social and political system of the new States. A successful maintenance of this claim would have altered the basis of the Constitution. The new States would have become members of a Union defined in part by the Constitution and in part by Congress. They would not have been admitted to “this Union,-” Their sovereignly would have been restricted by Congress as well as the Constitution. The demand was unconstitutional and subversive, but was prosecuted with an energy, and aroused such animosities among the people, that patriots, whose confidence had not failed during the Revolution, begain to despair for the Constitution.* Amid the utmost violence of this extraordinary contest, the expedient contained in the eighth section of this act was proposed, to moderate it, and to avert the catastrophe at menaced. It was not seriously debated, nor were its constitutional aspects severely scrutinized by Congress. For the first time, in the history of the country, has its operation been embodied in a case at law, and been presented to this court for their judgment. The inquiry is, whether there are conditions in the Constitutions of the Territories which subject the capacity and status of persons within their limits to the direct action of Congress. Can Congress determine the. condition and status of persons who inhabit the Territories ?
The Constitution permits Congress to dispose of and to make all needful rules and regulations respecting the territory or other property belonging to the United States. This power applies as well to territory belonging to the United States within the States, as, beyond them. It comprehends all the ■ public domain, wherever it may be. The argument is, that *510 the power to make “all needful rules and regulations” “is a' power of legislation,”--“a' full legislative power;” “that ifl* includes all subjects of legislation in the .territory,” and is without any limitations, except the positive prohibitions which afféct all the powers of Congress. Congress may then regulate or prohibit slavery upon the public domain within the new States, and such a prohibition would permanently affect the capacity of a slave, whpse master might cany him to it. And why not? Because no power has been conferred on Congress. This is a conclusion universally admitted. But the power to “make rules and regulations respecting the territory” is not restrained by- State lines, nor are' there any constitutional prohibitions' upon its exercise in the domain of the United States within the States; and whatever rules and regulations respecting territory Congress may constitutionally make are supreme, and are not dependent on the situs of “the territory."
.-The author of the Parmer’s tetters, so famous in the ante-revolutionary history, thus states the argument made by the-American loyalistssin favor of the claim of the British Parliament to legislate in all cases whatever over the colonies:' “It has been urged with great vehemence against us,” he says, “ and it seems to be thought their eoet by our adversaries, that a power of regulation is a power of legislation; and a power of legislation, if constitutional, must be universal and supreme, in the utmost sense of the word. It is therefore concluded that the, colonies, by acknowledging the power of regulation, acknowledged every other power.” '
This sophism imposed upon a portion of the patriots of that day. Qhief Justice Marshall, in his life of Washington, says “ that many of the best-informed men in Massachusetts had perhaps adopted the opinion of the' ’ parliamentary right of internal government over the colonies;” “that the English statute book furnishes many .instances of its. exercise; ” “that in no. case recollected, was their authority, openly controverted;” and “that the General Court of.Massachusetts, on a late occasion, openly recognised the principle.”’ (Marsh. Wash., v. 2, p. 75, 76.)
) But the more eminent men of Massachusetts rejected it; and -another patriot of the time employs the instance to warn us of. “the'stealth with which .oppression approaches,” and.“the enormities towards which precedents travel.” And the people of the United States, as we have seen, appealed to the last ár-fument, rather than acquiesce in their authority. . Could it' ave been the purpose of . Washington and his illustrious associates, by the nse of ambiguous, equivocal,, and expansite *511 ■words, such, as “rules,” “regulations,” “territory,” to re-establish. in the Constitution of their country that fort which had been prostrated amid the toils and with the sufferings and sacrifices of seven years, of war? Are these words-to be understood as the ITorths, the Grenvilles, Hillsboroughs, Huteh-insons, and Dunmores — in a word, as George. HE would have understood them — or are we to look for their interpretation to Ratrick Henry or Samuel Adams, to, Jefferson, and Jay, and Dickinson; to the sage Franklin, or to Hamilton, who- from his early manhood was engaged in combating British constructions of such words? we know that the resolution of Congress of 1780 contemplated that the new States to be formed under their recommendation were to have the same rights of sovereignty, freedom, and independence, as the old. That every resolution, cession, compact, and ordinance,' -of the States, observed the same liberal principle. That the Union of the Constitution is a union formed of equal States; and that new States, when admitted, were to enter “this Union,” Had another union been proposed in “any pointed manner,” it would have encountered not only “strong” but-successful opposition. The disunion between Great Britain and her colonies originated in the antipathy of the latter to “rules and regulations” made by a remote power respecting their internal policy. In forming the Constitution, this fact was ever pres-, .ent in the minds of its authors. The people were assured bv their most trusted statesmen “that the jurisdiction of the Federal Government is limited :to certain enumerated objects, which concern all members of the republic,”, and “that- the local or municipal authorities form distinct portions of su-premácy, no more subject within their respective spheres to the general authority, than the general authority-is subject to them within its own sphere.” Still, this did not content them. Upder the lead pf Hancock and Samuel Adams, of Patrick Henry and George Mason, they demanded an "explicit declaration that' no more power was to be exercised than they had delegated. And the ninth and tenth amendments to the Constitution- were designed to include the reserved rights of the States, and the people, within all the sanctions of that instrument, and to bind the authorities, State and Federal, by the judicial oath it prescribes, to their recognition and observance: Is it probable, therefore, that the supreme and irresponsible power, which is now claimed for Congress over boundless territories, the use of which cannot fail to react upon the political system of the States, to its subversion, was ever within the contemplation of the statesmen who, conducted the counsels of the people in the formation of this Constitution! ? When *512 the questions that came to the surface upon the acquisition of Louisiana were presented to the mind of Jefferson, he wroté: “I had rather ask an enlargement of power from the nation, where it is found necessary, than to assume it by a construction which would make our powers boundless. Our peculiar security is in the possession of a written Constitution. Let us not make it blank paper by construction. I say the same as to the opinion of those who consider the grant of the treaty-making power as boundless. If it is, then we have no Constitution. If it has hounds, they can he no others than the definitions of the powers which that instrument gives. It specifies and delineates the operations permitted to the Federal Government, and gives the powers necessary to carry them into execution.” The publication of the journals of the Federal Convention in 1819, of the debates reported by Mr. Madison in 1840, and the mass pf private correspondence of the early statesmen before and since, enable.us to approach the discussion Of the aims of those who made “the Constitution, with some insight and confidence.
I have endeavored, with the assistancé of these, to find a solution for the grave and difficult question involved in -this inquiry. My opinion is, that the claim for Congress of supreme power in the Territories, under., the grant to “dispose of. and make all needful rules and regulations respecting territory,” is. not supported by the historical evidence drawn from the Revolution, the Confederation, or the deliberations which preceded the ratification of the Federal Constitution. The ordinance of 1787 depended upon the action of the Congress of the Confederation, the,assent of the State ■'of Virginia, and the acquiescence of the people who recognised-the validity of that plea of necessity which supported so many of the acts of the Governments of that time; and the Federal Government accepted the ordinance as a recognised and valid engagement of the Confederation.
In referring to the precedents of ,1798 and 1800, 1 find the Constitution was plainly violated by the invasion of the rights of a sovereign State, both of soil and jurisdiction; and in reference to that of 1804, the wisest statesmen protested against it,' and' the President more than doubted its policy and the power of the Government.
Mr. John Quincy Adams, at a later period, says of the last act; “that the President found Congress mounted to the pitch of pássing those acts, without inquiring where they acquired the authority, and he conquered his own scruples as they, had done theirs.” But this court cannot undertake for themselvés the same conquest. They acknowledge that our peculiar se *513 curity is in the possession of a written Constitution, andthpy cannot make it blank paper by construction.
They look to its delineation of the operations of the Federal Government, and they must not exceed the limits it marks out, in their administration. ' The court have said “that Com gress cannot exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, .beyond what has been delegated.” "We are then to find the authority for supreme power in the Territories in the Constitution. "What are the limits upon the operations of á Government invested with legislative, executive, and judiciaiy powers, and charged with the power to dispose of and to make all needful rules and regulations .respecting a vast public dómain? The feudal system-would have recognised the claim made on behalf of the Federal Government for supreme. power over persons and things in the Territories, as an incident to this' title — that is; the title to dispose of and make rules' and regulations respecting it. .
The Norman lawyers of "William the Conqueror would have yielded an implicit assent to the doctrine, that a supreme sovereignty is an inseparable incident to a grant to dispose of and to make all needful rules and regulations respecting the public domain. But an American patriot, in contrasting the European and American systems, may affirm, “that European sovereigns, give lands to their colonists, but reserve to themselves a power to 'control their property, liberty, -and privileges; but 'the American Government sells the lands belonging to the>people of the' several States (i. e., United States) to their citizens, who are already in the possession of 'personal and political rights; which the Government did not give, and cannot take away.” And the advocates for Government sovereignty in the Territories have been compelled to abate a portion of the pretensions originally, made'in its behalf,, and to admit that the constata-tional prohibitions upon Congress operate in the Territories. But a constitutional prohibition -is not requisite to ascertain a limitation upon the authority of the several, departments' of the Federal Government. Nor are the States or p sople restrained by any enumeration or definition of their rights or liberties.
To impair ór diminish either, the department must produce an authority from the people themselves, in their Constitution; and, as we have seen,: a power to make rules and regulations respecting the public domain does not confer a municipal sov-ereignly' over persons and things upon it. But as this is “thought their fort ” by our adversaries, I propose a more definite.examination of it.- We-have seen, Congress does not *514 dispose of or make rules and regulations respecting domain belonging to themselves, but belonging to the United States.
These conferred on their mandatory, Congress, authority to dispose of the territory which belonged to' them in common; and to accomplish that object beneficially and effectually, they gave an authority to make suitable rules and regulations respecting it. "When the power of disposition is fulfilled, the authority to make rules and regulations terminates, for it attaches only upon territory “belonging to the United States.”
Consequently, the power to make rules and regulations, from the nature of the subject, is restricted to such administrative and conservatory acts as are needful for the preservation of the public domain, and its preparation for sale or disposition. The system of land surveys; the reservations for schools, internal improvements, military sites, and public buildings; the preemption claims of settlers; the establishment of land offices, and boards of inquiry, to determine the validity of land titles; the modes of entry, and sale, and of conferring titles;, the protection of the lands from trespass and waste; the partition of the public domain into municipal subdivisions, having reference" to the erection of Territorial Governments and States;- and perhaps the selection, under their authority, of suitable'laws for the protection of the settlers, until there may be a sufficient ¡number of them to form a self-sustaining municipal Government — these important rules, and regulations will sufficiently illustrate the scope and operation of the 3d section of the 4th article of the Constitution. - But this clause' in the Constitution ■does not exhaust the powers of Congress within the territorial .subdivisions,, or over the persons who inhabit them. Congress may exercise there all the powers of Government which belong to them as the Legislature of the United States, of which these 'Territories make a part. (Loughborough v. Blake, 5 "Wheat., 3817.) Thus the lays of taxation, for the regulation of foreign, Eederal, and Indian commerce, and so for the abolition of the slave trade, for the protection of copyrights and inventions, for the establishment of postal communication and courts of justice, and for the punishment of" crimes; are as operative there as within the States. I admit that to mark the bounds for ;thó jurisdiction of the Government of the United States within the Territory, and of its power in respect to persons and things within the municipal subdivisions it has created, is a work of delicacy and difficulty, and, in a great measure, is beyond the-cognizance of the judiciary.department of that Gov-' eminent. How much, municipal power may be exercised by the people of the Territory, before their admission to the Union, the courts ’©f justice cannot decide. This must depend, for *515 the most part, on political considerations, which cannot enter into the determination of a case of law or equity. I do not feel called upon to define the jurisdiction of Congress. It is sufii-cient for the decision of this case to ascertain whether the residuary sovereignty of the States or people has been invaded hy the 8th section of the act of 6th March, 1820,1 have1 cited, in so far as it concerns the capacity and status'oí persons in the condition and circumstances of the plaintiff and his family.
These ’ States, at the adoption of the Federal Constitution, were organized communities, having distinct systems of municipal law, which, though derived from a common source, and recognising in the main similar principles, yet in some respects had become unlike, and on a particular subject promised to be antagonistic.
. Their systems provided protection for life, liberty, and property, among their citizens, and for the determination of the condition and capacity of the persons domiciled within their limits. These institutions,, for the most part, were placed beyond the control of the Federal Government. The Constitution allows Congress to coin money, and1 regulate its value; to regulate foreign and Federal commerce; to secure, for a limited period, to authors and inventors, a property'in their writings and discoveries; and to make rules concerning captures in war; and, within the limits of these powers, it has. ■exercised, rightly, to a greater or less extent,.the power to determine what shall and what shall not be property.
"But the great powers of war and Negotiation, finance, postal communication, and commerce, in general, when employed in respect to the property of a citizen, refer to, and depend upon, the municipal laws of the States,' t© ascertain and determine what is property, and the rights of the owner, and the tenure by which it is held.
. "Whatever these Constitutions' and laws validly determine to be property, it is the duty of the Federal Government, through the domain of jurisdiction merely Federal, to recognise to be property.
■ And this principle follows from the structure of the respective Governments, State and Federal, and their reciprocal relations. They are different agents and trustees of the people of the several States, appointed with different powers and with distinct purposes, but whose acts, within the scope of their respective jurisdictions, are mutually .obligatory. They are respectively the depositories of such powers of legislation as .the people were willing to surrender, and their duty is to cooperate within their several jurisdictions to maintain the rights of the same citizens under, both Governments imim- *516 Íjaired. A proscription, therefore, of the Constitution and aws of one or more States, determining property, on the part of the Federal ’Government, by which the stability of its social system may be endangered, is plainly repugnant to the conditions on which the Federal Constitution was adopted, or which that Government was designed, to accomplish. Each of the States surrendered its powers of war and negotiation, to raise armies and to support a navy, and all of these powers are sometimes required to preserve a State from disaster and ruin. The Federal Government was constituted to exercise these powers for the preservation of the States, respectively, and to ■secure to all their citizens the enjoyment of the rights which were not. surrendered to the Federal Government. The provident care of the statesmen who projected the Constitution was signalized by such a distribution of the powers of Government as to exclude many of the motives and opportunities for promoting provocations and spreading discord among the States, and for guarding against those partial combinations, so destructive of the community of interest, sentiment, and feeling, which are so essential to the support of the Union. The distinguishing features of their system consist in the exclusion of the Federal Government from the local and internal concerns of, and in the establishment of an independent internal Government within, the States. And it is a significant fact in the history of the United States, that those controversies which have been productive of the greatest animosity, and have occasioned most peril to the peace of the Union, have had their origin in the. well-sustained opinion of a minority among the people, that the Federal Government had overstepped its constitutional limits to grant some exclusive privilege, or to disturb the-legitimate distribution of property or power among the States or individuals. Kor can a more signal instance of this be found than is furnished by the act before us. Eo candid ■ or rational man can hesitate to believe, that if the subject of the eighth section of the act of March, 1820, had never been introduced into Congress and made the basis of legislation, no interest common to the Union would have been seriously affected... And, certainly, the creation, within this Union, of large confederacies of unfriendly and frowning States, which has been the tendency, and, to an alarming extent, the result, produced by the agitation arising from it, does not commend it to the patriot or statesman. This court have determined that the' intermigration of slaves was ,not committed to the jurisdiction or control of Congress. "Wherever a master is entitled to go within the United States, his slave may’accompany him; without any impediment from, or fear of, Congres *517 sional legislation or interference. The question then arisés, whether Congress, which can exercise no jurisdiction, over the relations of master and slave within the limits of the Union, and is bound to recognise and respect the rights and relations that validly exist under the Constitutions and laws of the States, can deny the exercise of those rights, and prohibit thé continuance-of .those relations, within the Territories.
And the citation of State statutes prohibiting the immigrar tion of slaves, and of the decisions of State courts enforcing the-forfeiture of the master’s title in accordance with their rule, only darkens the discussion. Eor the question is, have Con-fress the municipal sovereignty in the Territories which the tate Legislatures have derived from the authority of the people, and exercise in the States?
And this depends upon the construction of the article in the Constitution before referred to.
And, in my opinion, that clause confers no power upon Congress to dissolve the relations pf the master and slave on the domain of the United States, either within or without any of the States.
The eighth section of the act of Congress of the 6th of March, 1820, did not, in my opinion, operate to determine the domestic condition and status of the plaintiff and his family during their sojourn in Minnesota Territory, or after their return to Missouri.
The question occurs as to the judgment to be given in'this case. It appeared upon the trial that the. plaintiff, in 1834, was in a state of slavery in Missouri, and he had been in Missouri for near fifteen years in that condition when this suit was brought. Nor does it appear that he at apy time possessed another state or condition,, de facto. -His claim to freedom depends upon his temporary elocation, from the domifeil of his origin, in company with his master, to communities where the law of slavery did not prevail. My examination is confined to the ease, as- it was submitted upon uncontested evidence, upon appropriate issues to the jury, and upon the instructions given and refused by the court upon that evidence. My opinion is, that the opinion of the Circuit Court was correct upon all the claims involved in those issues, and that the verdict of the jury was justified by the evidence and instructions.
The jury have returned that the plaintiff and his family are slaves.
Upon this record, it is apparent that this is not a controversy between citizens of different States; and that the plaintiff, dt no period of the life which has been submitted to the view of the court, has had a capacity to maintain a'suit in the courts *518 of the United States. And in so far as the argument of the Chief Justice upon the plea in abatement has a reference to the plaintiff or his family, in any of 'the conditions or circumstances of their lives, as presented in the evidence, I concur in that portion of his opinion. I concur in the judgment which ¿xpresses the conclusion that the Circuit Court should not have rendered a general judgment.
The capacity .of the plaintiff to sue is involved in the pleas in bar, and the verdict of the jury discloses an incapacity under the Constitution. Under the Constitution of the United States, his is an incapacity to sue in their courts, while, by the laws of Missouri, the operation of the verdict would be more extensive. I think it a safe conclusion to enforce the lesser disability imposed by the Constitution of the United States, and leave to the plaintiff all his rights in Missouri. I think the judgment should be affirmed, on the ground that the Circuit Court had no jurisdiction, or that the case should be reversed and. remanded, that the suit may be dismissed.
Mr. Justice C ATROhT.
The' defendant pleaded to the jurisdiction of the . Circuit Court, that the plaintiff was a negro of African blood; the descendant of Africans, who had been imported and sold in this country-as slaves-, and thus had no capacity as a-citizen of Missouri to maintain a suit in the Circuit Court. The court sustained a demurrer to this plea, and a trial was had upon the pleas, of the general issue, and also that the plaintiff ‘and his family were slaves, belonging to the defendant. In this ■trial,- a verdict was given for the defendant.
The judgment of the Circuit Court upon the plea in abáte-, mént is not open, in my opinion, to examination in this court upon the'plaintiff’s writ.
The judgment was given for him conformably to the prayer oí his demurrer. He cannot assign an error in such a judgment. (Tidd’s Pr., 1163; 2 Williams’s Saund., 46 a; 2 Iredell N. C., 87; 2 W. and S., 391.) ISTor does the fact that the judgment was given on a plea to the jurisdiction, avoid the application of this rule. (Capron v. Van Noorden, 2 Cr., 126; 6 Wend., 465; 7 Met., 598; 5 Pike, 1005.)
The declaration discloses a case within the jurisdiction of the court — a controversy between citizens of different States. The plea in abatement,- impugning these jurisdictional aver-ments, was waived when the defendant answered to the. declaration by pleas to the merits. The proceedings on that plea remain a part of the technical record, to show the history of the case, but are not open to the review of this court by a writ *519 of error. The authorities are very conclusive on this point. Shepherd v. Graves, 14 How., 505; Bailey v. Dozier, 6 How., 23; 1 Stewart, (Alabama,) 46; 10 Ben. Monroe, (Kentucky,) 555; 2 Stewart, (Alabama,) 370, 443; 2 Scammon, (Illinois,) 78.. Nor can the court assume, as admitted facts, the aver-ments of the plea from the confession of the demurrer. That confession was for a single object, and cannot be used for any other purpose than to test the validity of the plea. Tompkins v. Ashley, 1 Moody and Mackin, 32; 33 Maine, 96, 100.
There being nothing in controversy here but the .merits, I will proceed to discuss them.
The plaintiff claims to have acquired property in himself, and became free, by being kept in Illinois during two years.
The Constitution, laws, and policy, of Illinois, are. somewhat peculiar respecting slavery. Hnless the master becomes an inhabitant of that State, the slaves he takes there do not acquire their freedom; and if they return with their master to the slave State of his domicil, they cannot assert their freedom after their return. For the reasons and authorities on this point, I refer to the opinion of my .brother Kelson, with which I not only concur, but think his opinion is the most conclusive argument on the subject within my' knowledge.
It is next insisted for. the plaintiff, that his, freedom (and that of his wife and eldest child) was obtained by force of the act of Congress of .1820, usually known as the Missouri compromise act, which declares: “That in ,all that territory ceded by Franée to the United States, which lies north of thirty-six degrees thirty minutes north latitude, slavery and involuntaiy servitude shall be, and are hereby, forever prohibited.”
From this prohibition, the territory now constituting the State of Missouri was excepted; which exception to the stipulation gave it the designation of a compromise.
The first question presented on this act is, whether Congress had power to make such compromise. For, if power was wanting, then no freedom could be acquired by the defendant under the act.
That Congress has no authority to pass laws and bind men’s rights beyond the powers conferred by the Constitution, is not open to controversy. But it is insisted that, by the Constitution, Congress has power to legislate for and govern the Territories of the United States, and that by force of the power to govern, laws could be enacted, prohibiting slavery in any portion of the Louisiana Territory; and, of. course, to abolish slavery in all parts of it, whilst it was; or is, governed as a Territory.
My opinion is, that Congress is vested with power to govern *520 the Territories of the United States by force of the third see-, tion of the fourth article of the Constitution. And I will state my reasons for this opinion. . '
' Almost every provision in that instrument has a history that must be understood,'before the brief and sententious language employed can be comprehended in the relations its authors intended. We must bring before us the state of things presented to the Convention, and in regard to which it acted, when the compound provision was made, declaring: 1st. That “new States may be' admitted by the Congress into this Union.” 2d. “The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. And nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or any particular State.”
Having ascertained. the historical facts giving rise to these provisions, the difficulty of arriving at the true meaning of the language employed will be greatly lessened.
The history of these facts is substantially as follows:
The King of Great Britain, by his proclamation of 1763, virtually claimed that the country west of the mountains had been conquered from 'France, and ceded to the Crown of Great Britain by the treaty of Paris of that year, and he says: “"We reserve it under ou'r sovereignty, protection, and dominion, for the use of the Indians.”
This country was conquered from the Crown of Great Britain, and surrendered to the United States by the treaty of peace of 1783. The colonial charters of Virginia, North Caro-, lina, and Georgia, included it. Other States set up pretensions of claim to some portions of the territory north of the Ohio, but they were of no value, as I suppose. (5 Wheat., 375.)
.As this vacant country had been won by the blood and treasure of all. the States, those whose charters did not reach it, insisted that the country belonged to the States united,' and that the lands should be disposed of for the benefit of 'the whole; and to which end, the western territory should be ceded to the States united. The contest was stringent and angry, long before the Convention convened, and deeply agitated that body. As a matter1 of justice, and to quiet the controversy, Virginia consented to cede the country north .of the .Ohio as early as 1783; and in 1784 the deed of cession was executed," by her delegates in the Congress of the Confederation, conveying to the United States in Congress assembled, for the benefit of said States, “all right, title, and claim, as well of soil as of jurisdiction, which this Commonwealth hath to the territory or tract of country within the limits of the Vir *521 ginia charter, situate, lying, and being to the northwest of the river Ohio.” In 1787, (July 13,) the ordinance was passed by the old Congress to govern the Territory.
Massachusetts had ceded her pretension of claim .to western territory'in 1785, Connecticut hers in 1786, and blew York had ceded hers. In August, 1787, South Carolina ceded to the Confederation her pretension of claim to territory west of that Stated And bTorth Carolina was expected to cede hers, which she did do, in April, 1790. And so Georgia was confidently expected to cede her large domain, now constituting the territory of the States of Alabama and Mississippi.
At the time the Constitution was under consideration, there had been ceded to the United States, or was shortly expected to be ceded, all the western country, from the British Canada line to Florida, and from the head of the Mississippi almost to its mouth, except that portion which now constitutes the State of Kentucky.
Although Virginia had conferred on -the Congress of the Confederation power to govern the Territory north of the Ohio, still, it cannot be denied, as I think, that power was wanting to admit a new State under the Articles of Confederartion.
“With these facts prominently before the Convention, they proposed to accomplish these ends:
1st. To give power to admit new States.
2d. To dispose of the public lands in the Territories, and such as might remain undisposed of in the new States after they were admitted.
And, thirdly, to give .power to govern the different Territories as incipient States, not of the Union, and fit them for admission. Ko one in the Convention seems to have doubted that these powers were necessary. As early as the third day of its session, (May 29th,) Edmund Randolph brought forward a set of resolutions containing nearly all the germs of the Constitution, the tenth of which is as follows:
“ jResolved, That provision ought to be made for the admission of States lawfully arising within the limits of the United States, whether from a voluntary junction of government and territory or otherwise, with the consent of a number of voices in the Rational Legislature less than the whole.”
August 18th, Mr. Madison submitted, in order to be referred to the committee of detail, the following powers as proper to be added to those of the General Legislature:
“To dispose of the unappropriated lands of the.United. States.” “ To institute temporary Governments for new States arising therein.” (3 Madison Papers, 1353.)
*522 These, with the resolution, that a district for the location of the seat of Government should he provided, and some others, were referred, without a dissent, to the committee of detail, to arrange and put them into satisfactory language.
Gouverneur Morris constructed the clauses, and combined the views of a majority on the two provisions, to admit new States; and secondly, to dispose of the public lands, and to govern the Territories, in the mean time, between the cessions of the States and the admission into the Union of new States arising in the ceded territory. (3 Madison Papers, 1456 to 1466.)
It was hardly possible to separate the power “to make all needful rules and regulations ” respecting the government of the territory and the disposition of the public lands.
ISTorth of the Ohio, Virginia conveyed the lands, and vested the.jurisdiction in the thirteen original States, before the Constitution was formed. She had the sole title and sole sovereignty, and the same power to cede, on any terms she saw proper, that the 'King of England had to grant the Virginia colonial charter of 1609, or to grant the charter of Pennsylvania to William Penn. The thirteen States, through their representatives and deputed ministers in the old Congress, had the same right to govern that Virginia had before the cession. (Baldwin’s Constitutional Views, 90.) And the sixth article of the Constitution adopted all engagements entered into <by the Congress of the Confederation, as valid against the United States; and that the laws, made in pursuance of the new Constitution, to carry out this engagement, should be the supreme law of the land, and the judges bound thereby. To give the compact, and the ordinance, which was part of it, full effect under the new Government, the act of August 7th, 1789, was passed, which declares, “Whereas, in order that the ordinance of the United States in Congress assembled, for the government of the Territory northwest of the river Ohio, may have full effect, it is requisite that certain provisions should be made, so as to adapt the same to the present Constitution of the Uni-, ted States.” It is then provided that the Governor and other officers should be appointed by the President, with the consent of the Senate; and be subject to removal, &c., in like manner that they were by the old Congress, whose functions had ceased.
By the powers to govern, given by the Constitution, those amendments to the ordinance could be made, but Congress guardedly abstained from touching the compact of Virginia, further than to adapt it to the new Constitution. '' ■
It is due to myself to say, that it 4s asking much of a judge, *523 who has for nearly twenty years heen exercising jurisdiction, from the western Missouri line to the Rocky Mountains, and, oh this understanding of the Constitution, inflicting the extreme penalty of death for crimes committed where the direct legislation of Congress was the only rule, to agree that he had heen all the while acting in mistake, and as an usurper.
More than sixty years have passed away since Congress has exercised power to govern the Territories, hy its legislation directly, or hy Territorial charters, subject to repeal at all times, and it .is now too late to call that power into question, if this court could disregard its own decisions; which it cannot do, as I think. It was held in the case of Cross v. Harrison, (16 How., 193-’4,) that the sovereignty Of California was- in the Hnited. States, in virtue of the Constitution, hy which power had been given to Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, with the power 'to admit new States into the Union. That decision followed preceding ones, there cited. The question was then presented, how it was possible for the judicial mind to conceive that-the United States Government, created solely by the' Constitution, could, by a lawful treaty, acquire territoiy over which the acquiring power had no jurisdiction to hold and govern it, by force of the instrument under whose authority the country was acquired; and the foregoing was the conclusion of this court on the proposition, what was there announced, was most deliberately done, and with a purpose. The only question here is, as I think, how far the power of Congress is limited.
As to the Horthwest Territory, Virginia had the right to abolish slavery there; and she did so agree in 1787, with the other States in the Congress of the Confederation, by assenting to and adopting the ordinance of 1787, for the government of the Horthwest Territory. She did this also by an act of her Legislature, passed afterwards, which was a treaty in fact.
Before the new Constitution was adopted, she had as much right to treat and agree as any European Government had. And, having excluded slavery, the new Government was' bound by that engagement by article six of the new Constitution. This only meant that slavery should not exist whilst the United States-exercised the power of government, in the Territorial form; for, when a new State came in, it might do so, with or without slavery.
My opinion is, that Congress had no power, in' face of the -compact between Virginia and the twelve other States, to force slavery into the Northwest Territory, because there, it was bound to that “ engagement,” and could not break it.
*524 In 1790, North Carolina ceded her western territory, now the State of Tennessee, and stipulated that the inhabitants thereof should enioy all the privileges and advantages of the ordinance for governing the territory north of the Ohio river, and that Congress should assume the government, and accept the cession, under the express conditions contained in the ordinance': Provided, “ That no regulation made,, or to he made, by Congress, shall tend to emancipate slaves.”
In 1802, Georgia ceded her western territory to the United States, with the provision that the ordinance of 1787 should in all its parts extend to the territory ceded, “that article only excepted which forbids slavery.” Congress had no more power to legislate, slaveiy out from the North Carolina and Georgia cessions, than it had power to legislate slavery in, north of the Ohio. No power existed in Congress to legislate at all, affecting slavery, in either case. The inhabitants, as respected this description of property, stood protected whilst'they were governed by Congress, in like manner that they were protected before the cession was made, and when they were, respectively, parts of North Carolina and Georgia.
And how does the powér of Congress stand west of the Mississippi river? The country there was acquired from France, by treaty, in 1808.. It declares, that the First Consul, in the name of the French Republic, doth hereby cede to the United States, in full sovereignty, the colony or province of Louisiana, with all the rights and appurtenances of the said territory. And, by article third, that “the inhabitants of the ceded territory shall be incorporated in the Union, of the United States, and admitted' as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities, of citizens of the United States; and, in the mean time, they shall be maintained and protected in the free enjoyment of their liberty, property, and the religión which they profess.”
Louisiana was a province where slavéry was not only lawful, but where property in slaves was the most valuable of all per-, sonal property. The province was ceded as a unit, with an equal right pertaining to all its inhabitants, in every part thereof, to own slaves. It was, to a great extent, a vacant country, having in. it few civilized inhabitants. No one portion of the colony, of a proper size for a State of the Union had a sufficient number of inhabitants to claim admission into the Union. To enable the United States to fulfil the treaty, additional population was indispensable, and obviously desired with anxiety by both sides, so that' the whole country should, as soon as possible, become States of the Union. And for this *525 contemplated future population, tlie treaty as expressly provided as it did for the inhabitants residing in the province when .the treaty was made. All these were to he protected “in ike mean time; ” that is to say, at all times, between the date of the treaty and the time when the portion of the Territory where the inhabitants resided was admitted into -the Union as a State.
At the date of the treaty, each inhabitant had the right to the free enjoyment of his property, alike with his liberty and his religion, in every part of Louisiana; the province then being one country, he might go everywhere in it, and carry his liberty, property, and religiqn, with him, and in which he was to be maintained and protected, until he became a citizen of a State of the Union of the United States. This cannot be denied to the original inhabitants and their descendants. And, if it be true that immigrants were equally protected, it must follów that they can also stand on the treaty.
The'settled doctrine in the State courts of Louisiana is, that a French subject coming to the Orleans Territory,- after the treaty of 1808 was made, and before' Louisiana was admitted into the Union, and being an inhabitant at the time of the admission, became a citizen of the United States by that act; that he was one of the inhabitants contemplated by the third article of the treaty, which referred to all the inhabitants embraced within the new State on its admission.
That this is the true construction, I have no doubt.
If power existed to draw a line at thirty-six degrees thirty minutes north, so Congress had equal power to draw the line on the thirtieth degree — that is, due west from the city of blew Orleans — and to declare that north of that line slavery should never exist. Suppose this had been done before 1812, when Louisiana came into the Union, and the question of infraction of the treaty had then been presented on the present assumption of power to prohibit slavery, who doubts what the decision of this court would have been on such an act of Congress; yet, the difference between the supposed line, and that on thirty-six degrees thirty minutes north, is only in the degree of grossness presented by the lower line.
- The Missouri compomise line of 1820 was very-aggressive; it declared that slavery was abolished forever, throughout a country reaching from the Mississippi river to the Pacific ocean, stretching over thirty-two degrees of longitude, and twelve and a half degrees of latitude on its eastern side, sweeping over four-fifths, to say no more, of the original province ofLouisiana.
That the United States Government stipulated in favor of *526 the inhabitants to the extent heie contended for, has not been seriously denied, as far as I know; but the argument is, that Congress had-authority to repeal the third article of the treaty of 1803, in so far as it secured the right to hold slave property, in a portion of the ceded territory, leaving the right-to exist m other parts. In other words, that Congress could repeal the third article entirely, at its pleasure. This I deny.
The coúipacts withRorth Carolina and Georgia were treaties also, and stood on the saíne footing of the Louisiana treaty; on the assumption of power to repeal the one, it must have extended to all, and Congress could have excluded the slaveholder of Rorth Carolina from the enjoyment of his lands in the Territory now the State of Tennessee, where the citizens of the mother State were the principal proprietors.
And so in the case of Georgia. Her citizens could have been refused the right to emigrate to the - Mississippi or Alabama Territory, unless they left their most valuable and ’ cherished property behind them.
The Constitution was framed in reference to facts then existing or likely to arise: the instrument looked to no theories of Government. In the vigorous debates in the Convention, as reported by Mr. Madison and others, surrounding facts, and the condition and necessities of the country,' gave rise to almost every provision; and among those facts, it was prominently true, that Congress dare not be intrusted with power to provide that,' if Rorth Carolina or Georgia ceded her western territory, the citizens of the State (in either case) Gould be •prohibited, at the pleasure of Congress, from removing to their lands, then granted to a large extent, in the country likely to be ceded, unless they left their slaves behind. That such an attempt, in the face of a population fresh from the war of the Revolution, and then engaged in war with the great confederacy of Indians, extending from the mouth of the Ohio to the-Gulf of Mexico, would end in open revolt, all intelligent men knew.
In view of these facts, let us inquire how the question stands. by the terms of the Constitution, aside from the treaty ? How it stood in public opinion when the Georgia cession was made, in 1802, is apparent from the fact that no guaranty was required by Georgia of the United States, for the protection off slave property. The Federal Constitution was. reliéd on, to secure the rights .of Georgia and her citizens during the Territorial’ condition of the country. She relied on the indisputable truths, that the States were by the Constitution made equals, in political rights, and equals in the right to participate in the common property of all the States united, and held in trust for *527 them. The Constitution having provided that “ The citizens of each State shall he entitled to all privileges and immunities of citizens of the.several States,” the right to enjoy the territory as equals was reserved to the States, and to the citizens of the States, respectively. The cited clause is not that citizens of the United States shall have equal privileges in the Territories, but the citizen of each State shall come there in right of his State, and enjoy the common property. He secures his equality through the equality of his State, by virtue of that freat fundamental condition of the Union — the equality of the tates.
Qongress cannot do indirectly what the Constitution prohibits directly. H the slaveholder is prohibited from going to the Territory with his slaves, who are parts of his family in name and in fact, it will follow that men, owning lawful property in their own States, carrying with them the equality of their State to enjoy the common^- property, may be told, you cannot come here with your slaves, and he will be held out at the border. By this subterfuge, owners of slave property, to the ámount of thousand of millions, might be almost as effectually excluded • from removing into the Territory of Louisiana north of thirty-six degrees thirty minutes, as if the law declared that owners of slaves, as a class, should be' excluded, even if their slaves' were left behind.
Just as well might Congress have said to those of the North, you shall not introduce into the territory south, of said line your cattle or horses, as the country is already overstocked; nor can you introduce your tools of trade, or machines, as the policy of Congress is to encourage the culture of sugar and cotton south of the dine, and so to provide that the Northern people .shall manufacture for those of the South, and barter • for the staple articles slave labor produces. And thus the Northern farmer and mechanic would be held out, as the slaveholder was for thirty years, by the Missouri restriction.
If Congress could prohibit one spécies of property, lawful throughout Louisiana when it was acquired, and lawful in the State from whence it was brought, so Congrsss might exclude any of all propei’ty.
The ease before us will illustrate the construction contended for. Dr. Emerson was a citizen of Missouri ; he had an equal right to go to the Territory with every citizen of other .States,' This is undeniable, as' I suppose. Scott was Dr. Emerson’s lawful property in Missouri; he carried-his Missouri title with him; and the 'precise question here is, whether Congress had the power to annul that' title. It is idle to say, that if Congress could not defeat the tifie directly, that it might be’-'done *528 .indirectly, by drawing a narrow circle around the slave population of Upper Louisiana, and declaring that if the slave went beyond it, he should be free. Such assumption is mere evasion, and entitled to no consideration. And it is equally idle to contend, that because Congress has express power to regulate commerce among the Indian tribes,- and to prohibit intercourse with the Indians, that therefore Dr. Emerson’s title might be defeated within the country ceded by the Indians to the United States as early as 1805, and which embraces Fort Snelling. (Am. State Papers, vol. 1, p. 734.) We must meet the question, whether Congress had the power to declare that a citizen of a State, carrying with him his equal rights, secured to him through his State, could be-stripped of his goods and slaves, and be deprived of any participation in the common property? If this be the true meaning of the Constitution, equality of rights to énjoy a common country (equal to a thousand miles square) may be cut off by a geographical line,- and a great portion of our citizens excluded from it.
Ingenious, indirect evasions of the Constitution have been attempted and defeated heretofore. In the passenger cases, (7 How. R.,) the. attempt was made to impose a tax on the masters, crews,- and passengers of vessels, the Constitution having prohibited a tax on the vessel itself; but this court held the attempt to be a mere evasion, and pronounced the tax illegal.
I admit that Virginia 'could, and lawfully did, prohibit slavery northwest of the Ohio, by her charter of cession, añd that' ..the-territory was taken by the United 'States with this condition imposed. I álso admit that France could, by the treaty of 1803, have prohibited slavery in any part of the ceded territory,- and imposed it on the United States as,a fundamental condition of the cession, in the mean time, till new States were admitted,in the Union., _
_ I concur -with Judge Baldwin, that Federal power is exercised over all the territory within the United States, pursuant, to the Constitution; and, the conditions of the cession, whether it was a part of the original territory of a State of the Union, or of á foreign State, ceded by deed or treaty; the right of the United States in or over it depends on the contract of- cession, which operates to incorporate as well the Territory as its inhabitants into the Union. (Baldwin’s Constitutional Views, 84.)
My opinion is, that the third article of the treaty of 1803, ceding Louisiana to the United States,' stands protected by the Constitution, and cannot be repealed by Congress.
And, secondly, that the act of 1820, known as the Missouri *529 compromise, violates tlie most leading feature of the Constitution — a feature on which the Union depends, .and which secures to the respective States and their citizens an entire equality of rights, privileges, and immunities.
On these grounds, I hold the compromise act to have been void; and, consequently, that the plaintiff, Scott, can claim no benefit under it.
For the reasons above stated, I concur with my brother judges that the plaintiff, Scott, is a slave, and was so when this suit was brought.
Mr. Justice McLEAH and Mr', Justice CURTIS, dissented.

Mr. Vamum said: “The bill provided such a Government as had neVer been known in the United States.” . -Mr.-Eustis: “The Government laid down in this *508 bill'is.certainly a new thing in the United States.” Mr. Lucas: “It has been remarked, that tnis bill establishes eleinentary principles never previously introduced in the Government of any Territory of the United States.- Granting the truth of this observation,” He.) &c.- Mr. Macon: “My first objection to the principle. contained in this seotion is, that it-establishes a species of government un-. known to the United States.” Mr. Boyle: “Were ,the President an ángel instead of a man, I would not clothe him with this power.” Mr. G. W. Campbell: “On examining the section, it will appear' that it really establishes a complete despotism.”- Mr.-Sloan: “Gan anything be more repugnant to the principles of just government? Can apythipg be more despotic?” — Annals of Congress, 1803-4,

 Mr. Jefferson wrote: “ The Missouri question is the most portentous one that ever threatened our Union. In the gloomiest moments of the revolutionary war, ■ I never had any apprehension equal to that I feel from this source.”